768 P.2d 1161

**In the Matter of a Member of the State Bar of Arizona, Harry PAPPAS, Respondent.**

**No. SB–86–0011–D.**

Supreme Court of Arizona,
En Banc.

Dec. 8, 1988.

Harry Pappas, Phoenix, In Pro. Per.

Wilson, McConnell & Associates by Beverly J. McConnell, Phoenix, for State Bar.

FELDMAN, Vice Chief Justice.

This case presents another unfortunate example of a lawyer attempting to engage in arm's-length business transactions with a client. The client lost money, and the lawyer now objects to the Disciplinary Commission's recommendations that we disbar him. We have jurisdiction under Ariz. Const. arts. 3 and 6, and Rules 46, 52, and 53, Ariz.R.Sup.Ct., 17A A.R.S. (1988).

## I. PROCEDURAL HISTORY

The State Bar of Arizona charged respondent, Harry Pappas, with various violations of the Code of Professional Responsibility, Rule 29(a), Ariz.R.Sup.Ct., 17A

A.R.S. (1973).[1] On August 12, 1985 the Local Administrative Committee for District 5K (Committee) filed a formal complaint against respondent. *See* Rule 33(b)(2). The Committee heard the four-count complaint on September 17 and October 7, 1985. Respondent represented himself. Pursuant to Rule 35(c), the Committee filed its Findings of Fact and Recommendation (Findings) on December 11, 1985. It found that respondent violated five provisions of the former Disciplinary Rules and recommended disbarment as the appropriate sanction.

The Disciplinary Commission (Commission) reviewed the case on March 1, 1986. *See* Rule 36. The Commission adopted the Committee's findings of fact. It also affirmed five of the Committee's conclusions of law, modified a sixth, rejected one, and purported to add one of its own.[2] The Committee and Commission concluded that respondent violated Disciplinary Rules 5–101, –104, –105, and 6–101. These rules prohibit a lawyer from accepting employment when his own interests may impair his professional judgment (DR 5–101), or when the interests of multiple clients impair his judgment (DR 5–105). The rules also regulate a lawyer's business dealings with his clients (DR 5–104), and demand that a lawyer act competently with respect to a legal matter entrusted to him (DR 6–101). Agreeing with the Committee, the Commission recommended that respondent suffer disbarment.

This court accepted respondent's late filing of his Objections to Findings (*see* Rule 37(a)), thus bringing this matter before us for disposition. Rule 37.

## II. FACTS

### A. Standard of Review

We consider the facts as an independent "trier of both fact and law in the exercise of our supervisory responsibility over the State Bar" and its members. *In re Neville*, 147 Ariz. 106, 108, 708 P.2d 1297, 1299 (1985) (citing *In re Mercer*, 133 Ariz. 391, 393, 652 P.2d 130, 132–33 (1982)). In so doing, we give deference and serious consideration to the findings and recommendations of the Committee and Commission. *Neville*, 147 Ariz. at 108, 708 P.2d at 1299. Before we may impose discipline, we must be persuaded by clear and convincing evidence that respondent violated the disciplinary rules. *In re Kersting*, 151 Ariz. 171, 172, 726 P.2d 587, 588 (1986); *see also* current Rule 54(c). Otherwise stated, the evidence must convince us that it is "highly probable" respondent committed professional misconduct. *Neville*, 147 Ariz. at 111, 708 P.2d at 1302.

### B. The Parties Involved

Respondent is a licensed certified public accountant (CPA) and attorney. He was certified as an accountant in 1955 and admitted to the Arizona bar in 1970. Respondent's primary profession is his CPA practice, and he became an attorney only to become "a better CPA." Reporter's Transcript (RT), March 1, 1986, at 6. Respondent concentrates his practice on "tax returns, shelters, buy and sell agreements, some incorporations, areas where CPA's are very proficient and very comfortable and where clients are very comfortable with their CPA's." *Id.* at 7.

Frank and Walda Peterson (the Petersons) are a Phoenix couple. Mr. Peterson

1. Arizona Supreme Court rules hereinafter cited as "Rule _____."

 Because respondent's conduct occurred before February 1, 1985, former Rule 29(a) (Code of Professional Responsibility), rather than current Rule 42 (Arizona Rules of Professional Conduct) governs respondent's conduct. Order Deleting Rules 27 Through 49, Of The Supreme Court, And Substituting Amended Rules 27 Through 121, Rules of the Supreme Court, In Their Place, *reprinted in* 17A A.R.S. at 212 (1988). Furthermore, because the State Bar

made its probable cause determination before February 1, 1985, the former rules relating to disciplinary procedures also govern. *See id.* All references to Rules therefore refer to the former Rules unless otherwise indicated.

2. The Commission's own legal conclusion ("Commission Conclusion of Law No. 7") appears to be substantially the same as the modified Committee Conclusion of Law No. 6. Both conclusions of law concern DR 6–101(A)(3) (neglect of an entrusted legal matter).

is a successful rancher and farmer; Mrs. Peterson is a housewife who does not work outside the home. Both are high school graduates. Neither has much business experience other than that involved in operating their farm and ranch. Neither professes any sophistication in accounting, legal, or investment matters.

William Hankerson is an accountant practicing in the Phoenix area. He was respondent's accounting partner for a time in the accounting firm of Pappas & Hankerson, Ltd. Respondent and Hankerson also did business together in a general partnership called Maui Land Enterprises.

## C. Birth of Aloha Rent–A–Car

During 1972 and at the suggestion of their attorney, the Petersons approached respondent for counseling to minimize the tax consequences from a large cash payment from the state of Arizona in settlement of threatened condemnation proceedings. Respondent apparently handled the tax matter to the Petersons' satisfaction because he continued preparing their tax returns until approximately 1981.

Sometime during 1977 respondent and some associates began thinking about starting Aloha Rent–A–Car (Aloha), a car rental business on the island of Maui in Hawaii. Respondent was optimistic about the venture and offered to his accounting and legal clients [3] opportunities to invest in Aloha as both a tax shelter and an investment. Because respondent knew that the Petersons were due to receive a substantial

cash payment (apparently unrelated to the earlier condemnation case) late in 1977, he contacted the Petersons, informing them about Aloha. Respondent either explained to the Petersons or simply left the impression that he was one of Aloha's two general partners [4] and would have managerial control over Aloha's operations. He told them the general nature of Aloha's business and explained the tax benefits that would result from the Petersons' potential investment.

During December 1977 the Petersons received the anticipated cash payment and invested $50,000 in Aloha.[5] At the time they turned over their funds to respondent, a written partnership agreement had not yet been drafted. Apparently it was almost a month after the Petersons gave respondent their $50,000 check when they signed the Aloha agreement. A Hawaiian law firm drafted the agreement in accordance with respondent's instructions. Mrs. Peterson testified that she did not see the full agreement before she signed it; she recalled only seeing the signature page. Respondent never fully explained the terms of the limited partnership agreement, the nature of a general partner's interest as opposed to a limited partner's interest, and his relationship with Y's Car Rentals or Maui Land Enterprises.

## D. The Aloha Limited Partnership Agreement

The limited partnership agreement included the following provisions. In ex-

---

**3.** Respondent testified that all but one of the ten limited partners were accounting clients, and none was a law client at the time the Aloha partnership agreement was executed. RT, Oct. 7, 1985, at 29. He conceded that some limited partners became his legal clients after the execution of the agreement. *Id.*

**4.** The Aloha partnership agreement actually lists three general partners: Respondent and his accounting partner, William Hankerson (together doing business as Maui Land Enterprises, a general partnership), and Y's Car Rental, Inc., a Hawaii corporation. Y's Car Rental, however, was either controlled by respondent and Hankerson, the only two stockholders, or by Maui Land Enterprises. The record is unclear, but respondent apparently exercised control over Y's Car Rental either as an individual or

through Maui Land Enterprises. Thus, for all intents and purposes, Aloha had only two general partners—respondent and Hankerson.

**5.** After their initial $50,000 investment, the Petersons, at respondent's suggestion, invested an additional $19,869.01 in Aloha: $15,000 in a partial purchase of another limited partner's pre-subscribed interest and $4,869.01 in equipment for automobile parts. Thus, the Petersons' total contribution to Aloha, either in capital or advances, was $69,869.01. The Petersons were partially compensated for their loss in this venture by settling a related legal malpractice action they had filed against respondent. After their costs for pursuing that claim, the Petersons recouped approximately $45,000. Thus, the Petersons' net loss in this case is $24,869.

change for their capital contribution,[6] the ten limited partners were to receive a guaranteed fourteen percent per annum return on their investment, payable in monthly installments. The Petersons received these guaranteed payments for approximately two years. In addition to these payments, the limited partners qualified for appropriate tax deductions and write-offs on their income tax returns. Any net losses were first allocated to the limited partners in proportion to their capital contributions, but no limited partner's loss could exceed the amount of his capital account balance. Profits were divided half between the two general partners and half among the ten limited partners.

The general partners' initial capital contribution consisted of an assignment to Aloha of their interest in two contracts for the purchase of certain assets. For these two contracts, respondent and Hankerson, through Maui Land Enterprises, had advanced a total of $2,000 in earnest money. The Aloha partnership itself was liable for the $58,000 balance of the down payment on the contracts, but the general partners remained individually responsible for payment of deferred payments totalling $130,-000.[7] No provision exists in the partnership agreement for any capital contribution by the corporate general partner, Y's Car Rental.

In addition to their fifty percent share of the profits, the agreement entitled the general partners to a management fee of ten percent of Aloha's gross revenue.[8] The Aloha agreement obligated the general partners to make loans to the partnership when necessary, to expend necessary management time, to maintain the partnership's books and records, and to make regular monthly and annual accountings to the limited partners. Finally, the agreement contained an exoneration clause in which the limited partners agreed to hold the general partners harmless for losses suffered as a result of the general partners' actions, except their fraud.[9]

## E. Death of Aloha Rent–A–Car

Aloha Rent–A–Car ceased doing business on January 31, 1983. In its first five years of operation, even setting aside the depreciation factor, Aloha netted profits for only two years. See RT, Oct. 7, 1985, at 109. Apparently, for three of five years, Aloha had a negative cash flow. Respondent claimed that Aloha simply ran out of capital, and thus was unable to continue functioning. Id. at 104. Respondent also contended that extrinsic events exacerbated Aloha's financial difficulties. For example, he testified that during 1978 and 1979 Hawaii's economy almost slipped into "a very severe depression." Id. at 110. An airline strike occurred during the peak tourist season of Aloha's second year in operation which "curtailed travel to Hawaii drastically." RT, March 1, 1986, at 18. He further testified that because a DC–10 plane crashed in Chicago, the FAA ordered nationwide grounding of all DC–10s, thus reducing the number of flights to Hawaii. Id. ·Other testimony told tales of hurricanes wiping out half of Maui's beaches, and of labor strikes at Hawaii's airports. RT, Oct. 7, 1985, at 90–91. All in all, according to respondent, "travel agents were not recommending Hawaii as a nice spot to go to." Id. at 91.

The Committee and Commission heard this testimony, but concluded that the responsibility for Aloha's demise fell not on striking airline and airport workers, the

---

6. The total limited partners' initial capital contribution was $330,000. Not all of it was paid simultaneously, however. The general partners allowed some limited partners extra time to provide the funds. RT, Oct. 7, 1985, at 33–34.

7. Additionally, respondent and Hankerson personally signed for a line of credit for Aloha's use as well as offered their personal property to secure Aloha's other start-up debts. We note that, as a general partner, respondent's personal assets were always available to satisfy the partnership's debts.

8. Respondent testified that this management fee was never actually paid to the general partners.

9. It was this exoneration clause that caused the Committee to find respondent in violation of DR 6–102 (lawyer's attempt to limit liability to client). The Commission rejected this legal conclusion.

national air safety authorities, nor God, but rather on respondent. The Committee wrote:

> Respondent suggests that there was a drastic change in the market and circumstances in Hawaii at that time, which caused the business to fail. It does appear, however, that the general partners were too concerned with generating shelters and not sufficiently concerned with generating profit and a sound fiscal operation.

Findings, *supra*, Recommendations at 18. We agree with the Committee's characterization of events.

Respondent's conduct, which occurred during the upheavals he describes, could only have worsened matters. By failing to keep adequate records, tighter control on Aloha's "due from" accounts (accounts receivable from either the partners or other businesses in which respondent held an interest), and by concentrating on his "sophisticated tax strategies," respondent did little to help Aloha weather the economic storms of the times.

## III. RESPONDENT'S STATUS

The code provisions respondent allegedly transgressed contemplate the existence of an actual or potential attorney-client relationship. Disciplinary Rule 5–101 requires a *client*'s informed consent to any representation where the lawyer's own interests impair or may impair his professional judgment. Rule 5–104 regulates a lawyer's business relations with a *client*. Rule 5–105 involves multiple representation of *clients*. Rule 6–101(A)(3), concerning neglect of a legal matter entrusted to a lawyer, pre-supposes an attorney-client relationship. The issue, then, is whether the Petersons were respondent's clients in the Aloha transaction within the meaning of the cited disciplinary rules, thus triggering the ethical standards set forth in the Arizona Code of Professional Responsibility. But first, we consider what effect, if any, the holding of other professional licenses has on an attorney's responsibility under our ethical system.

## A. The Effect of Multiple Licenses

Respondent vehemently denies that the Petersons were his clients on the transaction in question. He even suggests that the Petersons' current attorney "planted" the idea of a previous attorney-client relationship between the Petersons and respondent in their mind for purposes of a legal malpractice action arising from these same facts. Objections to Findings, filed April 30, 1987, at 2. Respondent contends that he was merely the Petersons' accountant and investment adviser on the Aloha transaction, and, therefore, was not acting as their attorney. We disagree.

The duties of a lawyer who also holds other professional licenses cannot be circumscribed by the fine distinctions that we might draw between the nature of the services performed under a particular license. How is one to tell whether, in advising the Petersons about the tax consequences of the condemnation settlement, respondent acted as an accountant or a lawyer? Respondent could have given the same advice as a lawyer without having been licensed as an accountant. He might have given the same advice under his accountant's license, even though he had never been admitted to the bar. More importantly, how is any client to know when a lawyer *cum* accountant *cum* investment adviser removes one hat and puts on another? Respondent himself admitted that the distinctions between attorney, accountant, and tax adviser are far from clear. RT, Oct. 7, 1985, at 11.

*In re Dwight*, 117 Ariz. 407, 573 P.2d 481 (1977), addressed this precise issue. The client retained Dwight primarily for the purpose of investing her monies. *Id.* at 408, 573 P.2d at 482. We held that although he may act as an investment adviser or otherwise, an attorney was "bound by the ethical requirements of [the legal] profession, and he may not defend his actions by contending that he was engaged in some other kind of professional activity." *See id.* at 410, 573 P.2d at 484. Indeed, a lawyer may take his license with him when he engages in any type of activity. One court has gone so far as to discipline an

attorney who, representing himself in on-going litigation, communicated directly with the opposing party even though he knew the party was represented by counsel. *In re Segall,* 117 Ill.2d 1, 109 Ill.Dec. 149, 509 N.E.2d 988 (1987). Therefore, the lawyer generally takes his license with him when he enters into any relationship to provide a client with what the client may reasonably believe are law-related services.

## B. Respondent was the Petersons' Attorney

▮▮▮ Our holding that an attorney may be bound by legal ethics despite the fact that he may have been performing services under another professional license does not end our inquiry. We must still determine whether respondent was the Petersons' attorney during the Aloha transaction. We answer this question by applying our holding in *Neville.*

Neville was one of Bly's attorneys for approximately ten years. Neville sold Bly some real estate. We held that although Bly must have known that Neville was not acting as his attorney for that particular transaction, Bly was still Neville's "client" for purposes of DR 5–104(A). Thus, the disclosure requirements of that rule were applicable. *Neville,* 147 Ariz. at 111–12, 708 P.2d at 1302–03. This court also reasoned that, in attorney-client business ventures, an attorney is deemed to be dealing with a client when "it may fairly be said that because of other transactions an ordinary person would look to the lawyer as a protector rather than as an adversary." *Id.* at 111, 708 P.2d at 1302. We recognized that in applying the disciplinary rules we defined "client" in very broad terms, but we concluded that our obligation to police the profession and protect the public interest permitted no less. *See id.* at 112, 708 P.2d at 1303.

The Committee found that respondent owed the Petersons a fiduciary duty. Findings, *supra,* Conclusion No. 1. Applying *Neville,* the Committee concluded that the Petersons knew respondent was an attorney, believed him to be their attorney, and relied on him as their attorney. *Id.* Respondent himself acknowledges that he counseled the Petersons as an attorney at least once, albeit after the execution of the Aloha agreement.[10] RT, Oct. 7, 1985, at 9. The Petersons both testified that they relied on respondent to represent them as their attorney for the Aloha transaction. RT, Sept. 17, 1985, at 36, 38, 80–81. In fact, the Petersons did not seek out another attorney to review the Aloha agreement because they believed respondent to be acting as their attorney. *Id.* at 80. Respondent did not advise the Petersons to seek independent counsel. The record clearly supports the Committee's finding. Thus, under all the circumstances of this case, including the fact that the Petersons were unsophisticated investors, the Petersons' belief that respondent was their attorney was an objectively reasonable belief.

The absence of an articulated attorney-client relationship on this particular transaction does not preclude a finding that respondent was obligated to exercise his professional legal judgment on the Petersons' behalf. Because the Petersons reasonably thought of respondent as their attorney, we find respondent was obligated to behave as their attorney. The existence of an attorney-client relationship depends largely on the client's "belief that it exists." *Louisiana State Bar Ass'n v. Bosworth,* 481 So.2d 567, 571 (La.1986) (citing *Matter of McGlothlen,* 99 Wash.2d 515, 663 P.2d 1330 (1983), and E. Cleary, *McCormick on Evidence* § 88, at 208 (3d ed. [sic] 1972)).[11] Therefore, where a person holds an objec-

---

**10.** Also, Mr. Peterson testified that he may have received legal advice from respondent concerning landowner's rights in the earlier condemnation proceedings. RT, Sept. 17, 1985, at 37. Respondent denies this ever occurred. RT, Oct. 7, 1985, at 11.

**11.** We realize this rule of law developed out of cases involving client assertion of the attorney-

client privilege. *See McGlothlen,* 99 Wash.2d at 522, 663 P.2d at 1334 (citing E. Cleary, *McCormick on Evidence* § 88, at 179 (2d ed. 1972). We believe, however, that the intent behind both rules to be the same. Both the attorney-client testimonial privilege and bar discipline proceedings foster the public's confidence in the legal profession.

tively reasonable belief that a lawyer is acting as his attorney, relies on that belief and relationship, and the lawyer does not refute that belief, we will treat the relationship as one between attorney and client in bar disciplinary matters. *Neville,* 147 Ariz. 106, 708 P.2d 1297. We hold that in the Aloha transaction respondent and the Petersons were in an attorney-client relationship for purposes of the disciplinary rules at issue. We now consider the individual charges against respondent.

## IV. THE CHARGES

### A. DR 5–104(A)—Entering into the Transaction

This disciplinary rule provides in part:
DR 5–104. Limiting Business Relations with a Client

(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

 Because respondent and the Petersons entered into a business transaction by virtue of the Aloha agreement, DR 5–104(A) governs this specific aspect of respondent's conduct. If the lawyer and the client have "differing interests," the rule requires that the lawyer fully disclose those differing interests and obtain client consent before entering into the transaction. The Code of Professional Responsibility defines "differing interests" as:

every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest.

Code of Professional Responsibility, Definitions § 1, *reprinted in* Rule 29(a).

Thus, the interests need not be antagonistic, such as between buyer and seller. Respondent and the Petersons shared many mutual interests in Aloha. However, respondent's interests in profit and loss allocation, capital contribution, and the exoneration clause exemplify the differing in-

terests between respondent and the Petersons. Furthermore, and to an extent we need not define here, the interests of a general and limited partner always differ or diverge. On these facts, we hold that the Petersons and respondent had "differing" interests.

 We next determine if the Petersons expected respondent to exercise his professional judgment on their behalf and if respondent made full disclosure and obtained client consent. In *Neville* we wrote:

it is natural and proper for a client with a longstanding business relationship with a lawyer to feel that the lawyer is to be trusted, will not act unfairly, and will protect him against danger.

147 Ariz. at 112, 708 P.2d at 1303. Here, the record shows that respondent and the Petersons maintained an ongoing professional relationship since 1972. The Petersons testified, and the Committee found (Finding No. 4), that the Petersons considered respondent their attorney as well as their accountant and relied on him to protect their interests in the Aloha venture. Therefore, we agree with the Committee's Conclusion No. 3 that the Petersons expected respondent to exercise his professional judgment on their behalf. Findings, *supra,* Conclusion No. 3.

As to disclosure, respondent admitted that he did not advise the Petersons to seek independent advice nor did he "counsel the Petersons, as he would [have counseled] a client coming to him ... for legal advice regarding an investment opportunity, to which he was not a party." Findings, *supra,* No. 4. This, however, is exactly what DR 5–104(A) required of respondent to satisfy the burden of full disclosure. *Neville,* 147 Ariz. at 113, 708 P.2d at 1304. To comply with DR 5–104(A), an attorney must provide a detailed explanation of "all terms that are either advantageous to the lawyer or disadvantageous to the client." *Id.* (citing *People v. Cameron,* 197 Colo. 330, 595 P.2d 677 (1979)). Respondent admits that he did not so explain the terms of the Aloha agreement. The Committee also found that the Petersons "did not understand the legal effect of the agreement,

nor the mechanics of how the partnership would be ... operated." Findings, *supra*, No. 4.

■ We find many terms in the agreement at least arguably disadvantageous to the Petersons and advantageous to respondent. For example, profits were to be split 50–50 between the two general partners on the one side and the ten limited partners on the other,[12] notwithstanding that the general partners' initial capital contribution was only $2,000 while the limited partners' initial capital contribution was $330,000. Also, the agreement, *provided by respondent,* contained a clause exonerating the general partners from all losses except those caused by their fraud. These clauses represent only two of the agreement's provisions that DR 5–104(A) required respondent to explain to the Petersons.

We agree with the Committee that respondent violated DR 5–104(A) by entering into a business transaction without his clients' consent after full disclosure and under circumstances where the clients "had differing interests than he ... and ... they reasonably expected him to exercise his professional judgment for their protection." Findings, *supra*, Conclusion No. 3.

## B. DR 5–101—The Operation of Aloha

Disciplinary Rule 5–101, in pertinent part, provides:

> DR 5–101. Refusing Employment when the Interests of the Lawyer May Impair His Independent Professional Judgment
>
> (A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

The Committee found that respondent violated this rule because without the Pe-

tersons' consent and without making full disclosure, he continued representing them in the Aloha transaction "under circumstances where his professional judgment on their behalf should reasonably have been expected to be impaired or compromised; and where such professional judgment was factually impaired and compromised by his own financial ... interests." Findings, *supra*, Conclusion No. 4. The findings and record amply support this conclusion. The limited partnership agreement provided that the limited partners would contribute $330,000 in capital, and that the general partners would contribute $2,000 in capital and "would remain responsible for payment of deferred payments [on contracts to purchase certain assets for Aloha] totalling $130,000." Findings, *supra*, No. 5. So far as the record indicates, the general partners used partnership funds in making these payments without informing the limited partners.

Even worse, while a general partner at Aloha, respondent engaged in self-dealing by transacting business with many other commercial entities in which he held an interest.[13] The transactions included the transfer of substantial funds from one business to the other through receivable and payable accounts but without proper bookkeeping. *See* Findings, *supra*, Nos. 9 and 11. Substantial funds from Aloha's account were used to acquire respondent's personal interest in Hawaii Rent–A–Car and payments were made from Aloha's account on condominiums owned either by respondent, Hankerson, or Maui Land Enterprises. Findings, *supra*, No. 10. Supposedly, respondent acquired these properties for Aloha's benefit, but no legal documents support this claim. Respondent never advised the limited partners that he commingled partnership funds with other funds, or that he transferred partnership assets to business entities in which he held an interest. Findings, *supra*, No. 13.

---

12. Thus, respondent received 25 percent of the profits while the Petersons received 2.5 percent of the profits.

13. Respondent's other business interests included Pappas & Hankerson, Ltd.; Maui Land Enterprises; Y's Car Rental, Inc.; Milo Fish Company; Kuai Rent–A–Car Company; Garden Island U–Drive; Hawaii Rent–A–Car; Hassayampa Mining and Development; Phoenix Software Developers; to name a few.

Respondent's poorly kept documentation for the "cycling" of funds through Aloha, Aloha's use as a "clearinghouse" for various transactions, and the commingling of Aloha's funds with respondent's personal funds and those of his other business interests exhibit professional judgment that leaves everything to be desired. This situation would be bad enough for an "ordinary" lawyer, but is compounded because respondent is also a certified public accountant. Respondent's own testimony summarizes the most charitable view of the state of Aloha's books and how they reflect its business affairs:

[I]t can be untangled; it's just a monumental chore [to do so].

RT, Oct. 7, at 179; *see* Findings, *supra*, Nos. 11 and 12.

Given the attorney-client relationship between respondent and the Petersons and the facts recited in this section of the opinion, we agree with the Committee that when respondent undertook and continued to represent the Petersons in the Aloha transaction without full disclosure and subsequent consent, he violated DR 5–101. He represented the Petersons under circumstances where his "professional judgment was factually impaired and compromised by his own financial, business, property and personal interests." Findings, *supra*, Conclusion No. 4.

C. DR 5–105—Multiple Interests, Multiple Clients, and the "Clearinghouse"

 This rule provides in pertinent part:

DR 5–105. Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

The State Bar argues that respondent violated this rule by representing the Petersons and others in the Aloha transaction when the various interests of these multiple clients impaired or adversely affected his independent professional judgment. In this respect the Committee wrote,

... by acceptance and continuance of representation of such multiple interests, [respondent] has placed himself in an impossible position. Thus, he has tried to balance the interest of these various entities under circumstances where a judgmental decision on behalf of one client, [sic] very often resulted in a detriment to another client or another of his interests.

Findings, *supra*, Recommendations, at 17. The record compels us to agree with the Committee and hold that respondent violated DR 5–105.

Respondent represented the Petersons as well as other limited partners in his capacity as an attorney and CPA. *See* Findings, *supra*, Nos. 17A and 17B; note 3, *supra*. The facts demonstrate that this multiple representation affected respondent's professional judgment. For example, respondent acknowledges that Aloha's checking accounts were used as a "clearinghouse" to pay debts other than those properly attributable to Aloha. The records respondent supplied to the Committee are so jumbled that untangling these "clearinghouse transactions" is practically impossible. On liquidation, respondent transferred Aloha's assets among different entities, and he treated various partners differently. As Aloha floundered, respondent allowed some limit-

**526**

ed partners to withdraw from the partnership without informing the remaining partners or affirmatively offering them the same opportunity. We agree with the Commission's conclusion that the multiple client representations impaired respondent's professional judgment and violated DR 5–105. *See* Findings, *supra*, Conclusion No. 5.

### D. DR 6–101(A)(3)—The Records

■ This rule provides that a "lawyer shall not: ... (3) Neglect a legal matter entrusted to him." Neither the State Bar nor the Committee identified a specific legal matter respondent neglected. Bar counsel and the Committee both contend that respondent violated this rule by betraying the Petersons' trust in him. They cite the previously discussed episodes of respondent's misconduct. We need not decide, however, whether a betrayal of trust violates DR 6–101(A)(3).

Neglect, as we define the term, cannot be limited to total abandonment of the legal matter, but must also include the failure to act with minimal efficiency. *See In re Watson*, 118 Ariz. 70, 574 P.2d 1289 (1977) (attorney suspended under this rule for conduct less than complete abandonment); *see also* Canon 6, Code of Professional Responsibility, *reprinted in* Rule 29(a). Respondent failed to provide the monthly and annual accountings to the Petersons and other limited partners; he failed to keep adequate records of the myriad of transactions involving Aloha, records that would have enabled the limited partners to understand what was happening financially with the partnership and that might have enabled the investors to recover some of their capital; and he even failed to notify the limited partners of the liquidation of the partnership's assets until well after that liquidation. We find that respondent violated DR 6–101(A)(3).

### V. APPROPRIATE SANCTIONS

#### A. Standards

The three members of the Committee and six members of the Commission who voted in this case unanimously favored disbarment. We approach the final decision with deference to their recommendations. *Neville*, 147 Ariz. at 115, 708 P.2d at 1306. In imposing lawyer sanctions, we are guided by the principle that "the purpose of bar discipline is not to punish the lawyer but to deter others and protect the public." *Kersting*, 151 Ariz. at 179, 726 P.2d at 595; ABA, *Standards for Imposing Lawyer Sanctions*, § 1.1 (1986) (and commentary thereto). We are guided also by the principle that an effective system of professional sanctions must have internal consistency. *Standards, supra,* preface.

■ Thus, it is appropriate to examine sanctions imposed in cases factually similar to respondent's and to consider the ABA standards cited above. *People v. Bell*, 150 Colo. 245, 247, 372 P.2d 436, 438 (1962); *Standards, supra*, § 1.3 (one of purposes of these standards is to promote "consistency in the imposition of disciplinary sanctions for same or similar offenses" within the same jurisdiction); *see In re Wines*, 135 Ariz. 203, 207 & n. 6, 660 P.2d 454, 458 & n. 6 (1983) ("neither perfection nor absolute uniformity" is achievable among sanctions imposed in bar disciplinary matters, but the State Bar must carefully examine the proportionality of each sanction recommendation). Proportionality furthers the goals of lawyer discipline—deterrence and public protection—and also creates confidence in our self-policing system. It would be helpful, therefore, in the future if the Commission's order were to cite the proportionality considerations of its sanction recommendations.

#### B. Application to Facts

We begin by noting that respondent's ethical transgressions center on his failure to appreciate the various differing financial, personal, and economic interests among and between himself, the Petersons, and other clients. Respondent failed to fully disclose and explain those differing interests to people to whom he owed a fiduciary duty. *See Neville*, 147 Ariz. at 113, 708 P.2d at 1304.

Determining the proper discipline requires us to consider mitigating and aggravating factors. *Standards, supra,* §§ 3.0(d), 9.2, and 9.3 (and commentary thereto); *see Kersting,* 151 Ariz. at 179, 726 P.2d at 595 (considering mitigating factors); *and Neville,* 147 Ariz. at 116, 708 P.2d at 1307 (same). We give weight to the following mitigating factors. First, we acknowledge the lack of any prior disciplinary record against respondent. Next, we note that the Committee stated that it "[d]id not conclude that respondent intended to defraud any of his clients or to serve only his personal interests...."[14] The "relatively undefined nature" of respondent's relationship with the Petersons is also a mitigating factor. *See Neville,* 147 Ariz. at 116, 708 P.2d at 1307 (considering as a mitigating factor the undefined nature of the relationship).

Failure to cooperate with disciplinary authorities is a significant aggravating factor. *See Standards, supra,* § 9.22(e); C.W. WOLFRAM, MODERN LEGAL ETHICS 123 (1986); *and see* DR 1-102(A)(5).[15] We find this factor exists here. Throughout the Bar's investigation and hearings, bar counsel repeatedly sought Aloha's original journals and ledgers. The purpose of this request was to attempt to untangle the voluminous transactions made through Aloha by respondent and his other business ventures. Despite having access to these records, respondent never produced them. Instead, he produced summaries of the books, and at the Commission hearing he sought to introduce some of the checks that reflected the actual transactions.

Respondent seems to argue that the Committee should have taken his word

for the propriety of the transfers of assets between various entities and that it was up to the clients or the Committee to construct or reconstruct records to prove that the transfers were improper. We firmly reject such a proposition. Lawyers have an obligation to produce and return funds paid them by clients or to provide documentation to establish that the funds were properly used for the purposes for which they were given. We refuse to put the burden on the clients to establish what their lawyer did with their money. To the contrary, we require lawyers to keep records that account in an acceptable manner for funds clients entrust to them.

Therefore, we agree with the Committee that respondent's actions exceeded simple bad judgment, but, rather, displayed "a gross disregard of the interest of specific clients in deference to the interests of other clients or other business interests of respondent." Findings, *supra,* Recommendations, at 18. We disagree, however, with the recommended sanction. It is our judgment that respondent be suspended rather than disbarred.

This sanction is in accord with the cited ABA standards. Standard 4.32 provides:

> Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

We believe this to be the standard most applicable on these facts.[16] Respondent, at the least, should have known of the various conflicts of interest present any time a lawyer induces clients to invest in his business ventures. Respondent failed to fully

---

**14.** This, of course, falls somewhat short of a finding that respondent acted out of benign or praiseworthy motives, and it is a finding we might not necessarily have made ourselves. Because we especially defer to Committee findings based on witness credibility, however, we leave this finding undisturbed. *See Kersting,* 151 Ariz. at 172, 726 P.2d at 588.

**15.** Were respondent's actions governed by the Rules of Professional Conduct, his failure to cooperate could, in and of itself, be a ground for

sanctions. *See* ER 8.1(b) (and comment thereto).

**16.** Standard § 4.31, which recommends disbarment for a lawyer's violation of conflict of interest rules, only applies when the lawyer acted "with the intent to benefit the lawyer or another." *Id.* In light of the fact that neither the Committee nor the Commission concluded that respondent acted with fraudulent or purely selfish motives, we decline to find this standard applicable in this case.

disclose to his clients the effects of that conflict of interest, and the clients suffered injury.

Suspension is also proportional in light of our recent bar discipline cases. In *Neville*, 147 Ariz. 106, 708 P.2d 1297, we considered the case of a lawyer who had violated DR 5–104 and –105 and imposed only the sanction of censure. The sanction here should be more severe. In *Neville*, the lawyer dealt with a former client who was a sophisticated investor and who knew that his former lawyer was acting in an adverse capacity. *Id.* at 116, 708 P.2d at 1307. More importantly, in *Neville* there was "no evidence of ... [a] knowing violation of fiduciary duty. Nor has there been any damage to the client." *Id.* We cannot say the same here. The facts show multiple breaches of fiduciary duty. Respondent commingled clients' funds with other funds from other businesses, transferred funds from one business to the other, used funds deposited in the business partnership account for improper purposes, did not keep proper records, cannot produce sufficient documentation, and cannot account for the funds.

When the business failed and respondent undertook some form of self-help liquidation, he failed to inform his investors/clients, and he instructed one of the accountants at his accounting office to answer all inquiries from those clients with a statement containing representations that Aloha still had "substantial assets available for sale, including real estate and plans to liquidate ... and pay off all investors." Findings, *supra*, No. 8. These representations avoid being outright falsehoods only by a charitable reading of the facts. Finally, respondent sold the remaining assets on liquidation to companies in which he held an interest. Findings, *supra*, No. 16. Censure is far too mild a sanction.

Bar counsel cites us to *In re Dwight*, 117 Ariz. 407, 573 P.2d 481 (1977), as authority for disbarment. Although we acknowledge that some of *Dwight*'s facts are similar to the instant case, we note that the local committee concluded that Dwight made knowing misrepresentations to his client as well as tried to mislead the committee. *Id.* at 408, 410, 573 P.2d at 482, 484. The Committee made no such findings in this case. Nor, bad as they are, do the facts of this case approach those in *Dwight*, where the lawyer/accountant misappropriated and pocketed his client's funds. Further, we decided *Dwight* before promulgation of the cited ABA Standards to which we now give consideration.

Unlike *Dwight*, neither the Committee nor the Commission made a specific finding of dishonesty. Consequently, in view of the ABA Standards recommending disbarment only when the lawyer acted with intent to benefit others besides his clients, *see* note 16, *supra*, we decline to disbar respondent.

## VI. DISPOSITION

We approve, therefore, the Committee's findings and conclusions as modified by the Commission. Pursuant to Rule 37(g), we order respondent to pay costs of $3,884.35. The court further orders respondent suspended from the practice of law for a period of five years from the date of this opinion.

CAMERON, HOLOHAN and MOELLER, JJ., concur.

GORDON, C.J., recused himself and did not participate in the determination of this matter.