795 P.2d 201

**In the Matter of a Member of the State Bar of Arizona, David Allen MYERS, Respondent.**

**No. SB–89–0037–D.**

Supreme Court of Arizona,
En banc.

July 26, 1990.

Kenneth D. Freedman and Paul Bender (pro hac vice), Phoenix, for respondent.

Fennemore Craig, P.C. by John G. Ryan, Jeffrey A. Grabowski and Harriet L. Turney, Chief Counsel, State Bar of Arizona, Phoenix, for Disciplinary Com'n.

## OPINION

FELDMAN, Vice Chief Justice.

David A. Myers (respondent) appeals from the Disciplinary Commission's (Commission) recommendation that he be publicly censured for his failure to appear on his client's behalf at an immigration hearing. We have jurisdiction under Rule 53(e), Ariz. R.Sup.Ct., 17A A.R.S. Respondent argues that he did not violate any provisions of the

Code of Professional Responsibility [1] with which he was charged, so that no discipline is appropriate.

## FACTS

On September 9, 1985, the State Bar received a letter from Chief Immigration Judge William R. Robie stating that respondent had "failed to notify his client of the time and place of a hearing on his asylum application [and] [a]s a result, neither the alien nor his counsel was present at the hearing." The hearing had taken place almost one year before, on September 19, 1984.

After reviewing Judge Robie's letter and the facts concerning the occurrence, the Probable Cause Panel issued an informal reprimand on January 6, 1986. Because respondent requested a formal hearing pursuant to Rule 53(b)(4), the reprimand was withdrawn and the following formal complaint was filed:

## COUNT ONE

Respondent improperly represented his client by failing to notify him of the scheduled deportation hearing date or undertake any legal activity on his behalf, thereby *intentionally failing* to [seek] the lawful objectives of his client in violation of Disciplinary Rule 7–101(A)(1).

## COUNT TWO

Respondent, throughout the time during which he represented his client, *intentionally neglected* a legal matter entrusted to Respondent in violation of Disciplinary Rule 6–101(A)(3).

1. The conduct in question occurred prior to the adoption of the Rules of Professional Conduct, Rule 42, Ariz.R.Sup.Ct., 17A A.R.S., effective February 1, 1985. Therefore, former Rule 29(a), Arizona Code of Professional Responsibility, governs respondent's conduct rather than current Rule 42. *See* Order Deleting Rules 27 Through 49, Of The Supreme Court, And Substituting Amended Rules 27 Through 121, Rules of

## COUNT THREE

Respondent, throughout the time during which he represented his client, *intentionally prejudiced* the rights of his client in violation of Disciplinary Rule 7–101(A)(3).

Complaint, filed Apr. 24, 1986 (emphasis added).

Respondent filed a motion to dismiss on November 5, 1986. The State Bar filed a motion for judgment on the pleadings on December 22, 1986. Hearing Committee 6C convened on February 28, 1987 and granted the State Bar's motion. The Committee recommended public censure. Hearing Committee Recommendation of Discipline, filed Apr. 13, 1987. Respondent timely filed his objections with the Commission. By order filed October 30, 1987, the Commission remanded to a hearing committee so a hearing could be conducted.

A hearing was convened before Hearing Committee 6G (Committee) on November 2, 1988. The Committee took evidence, deliberated, and concluded as follows:

The Committee finds that there is insufficient evidence that Respondent violated any canon of ethics as charged. The Committee therefore recommends dismissal of this matter.

Hearing Committee Report, filed Dec. 21, 1988.

The Commission reviewed the case. Bar counsel waived his presence and authorized respondent's counsel to present to the Commission his view that the decision of the Committee be upheld and affirmed. The Commission declined to do so. *See* Commission Report, filed Mar. 2, 1989. It rejected the Committee's recommendation that the complaint against respondent be dismissed. Instead, it concluded, based on its belief that clear and convincing evidence existed, that:

the Supreme Court, In Their Place, *reprinted in* 17A A.R.S. at 212 (1988). Because the State Bar commenced proceedings after February 1, 1985, however, the current rules relating to disciplinary procedures govern. *Id.* References to the Arizona Supreme Court Rules will be cited as "Rule ____" and will refer to the current rules unless otherwise indicated.

1. Respondent *failed to act diligently* in representing his client by failing to notify him of a scheduled [deportation] hearing and by failing to appear himself at the time and place scheduled for the hearing, thereby failing to seek the lawful objectives of his client, in violation of DR 7–101(A)(1).

2. Respondent *neglected* a legal matter entrusted to him by failing to appear at the time of the scheduled deportation hearing, in violation of DR 6–101(A)(3).

3. Respondent *failed to notify* his client or to appear. himself before the Immigration Court, prejudicing the rights of his client, in violation of DR 7–101(A)(3).

Commission Report (emphasis added). The Commission recommended that respondent be publicly censured.

Respondent timely filed an appropriate objection in this court. *See* Rule 53(e).

## DISCUSSION

▮▮▮ We review the record as the ultimate finder of fact. *See In re Nefstead*, 163 Ariz. 518, 789 P.2d 385 (1990). Nonetheless, we give deference and serious consideration to the findings of the Committee and Commission. *In re Pappas*, 159 Ariz. 516, 518, 768 P.2d 1161, 1163 (1988). Before we impose discipline, we must be persuaded by clear and convincing evidence that respondent committed the violations with which he was charged. *Id.*

▮▮▮ It is true respondent did not appear at the hearing scheduled before the immigration judge, Hon. John T. Zastrow, on September 19, 1984. We approve, however, the conclusion the Committee evidently reached after hearing testimony: respondent's failure to appear could not be attributed to either a lack of desire or effort to serve his client. Respondent testified at the hearing that he had been unaware the client had been released on bail due to the efforts of another lawyer. Respondent attempted to locate his client, but was unable to find either his address or telephone number. The evidence supports the conclusion that respondent had no way to notify his client of the hearing date or to procure his appearance at the hearing before the immigration judge. No intentional failure to notify his client can be inferred from these facts.

The record also clearly supports the conclusion that respondent believed it was in his client's best interests that he not make an appearance without the client. Respondent believed if he appeared alone, he could not obtain asylum status for his client. Therefore, his appearance would not benefit his client and might harm him because, respondent believed, by entering an appearance for the client, he might subject him to the jurisdiction of the immigration court and possible deportation. This was a risk respondent did not wish to take because, after researching the issue, he thought the notice of hearing, served only on him and not on the client, was fatally defective from a jurisdictional standpoint.[2] The State Bar argues that respondent was wrong in these legal positions. Respondent admits that, in retrospect, he may have handled the situation differently, but avows that at the time, after only four months of practice in a highly technical area of the law, he felt his position was strategically correct and legal-

**2.** Testimony at the hearing by an attorney specializing in immigration law indicated that the practice of sending notice only to attorneys and not to the clients was new at the time and that she shared respondent's concerns about due process. Transcript of Proceedings Before Disciplinary Committee 6G, Nov. 2, 1988, at 24.

Immigration Judge John J. McCarrick testified, describing the law in this area as "Byzantine." *Id.* at 79. He explained as follows:

The Immigration Court used to be part of the Immigration and Naturalization Service. In about 1982 the Justice Department decided to sever the judicial function of the Immigra-

tion Service and house it in a separate agency....

A lot of the regulations that you will see in 8 CFR refer to the service and came into play at the time when the Immigration Department was part of the Service. They don't anymore, but they haven't been amended to reflect the change, so there—as a result there is a considerable amount of confusion concerning the regulations that apply to the Court now because they are in—they are in language that doesn't relate to the Court itself or refers to the Service.

*Id.*

ly justifiable as in the best interests of his client.

In our view, the case does not turn on whether respondent was correct in his legal position, but whether he had a good faith belief in that position, based on some tenable legal argument. Considering the confusing nature of the procedural rules in immigration court at the time respondent made his decision, we accept, as the Committee must have, that his legal arguments are defensible. The fact that respondent's legal conclusions may have been incorrect does not indicate that, as charged, he *intentionally* failed to advance his client's lawful objectives in violation of DR 7–101(A)(1), *intentionally* neglected a legal matter in violation of DR 6–101(A)(3), or *intentionally* prejudiced his client's rights in violation of DR 7–101(A)(3).

Although respondent intentionally failed to go to the hearing, no evidence exists to support the idea that he did so because he abandoned his client or knowingly neglected his client's welfare. Rather the record convinces us, as it evidently convinced the Committee, that he thought by not appearing he would be helping his client. *Compare In re Cardenas*, 164 Ariz. 149, 791 P.2d 1032 (1990); *In re Anderson*, 163 Ariz. 362, 788 P.2d 95 (1990). He attempted to locate and identify the client, researched his legal position, and made a good faith decision that his appearance was unnecessary and perhaps would even be detrimental to his client's legal position. While there is a possibility that respondent mismanaged the case, there is no evidence he did so knowingly or intentionally, or that he abandoned his client's interests. The evidence in this case, *at most*, points to an incorrect legal judgment, mistake of law, or improper strategy. We do not

equate such matters with knowing or intentional derelictions of a lawyer's duty to his client that should warrant discipline.[3]

The conclusion that respondent sought only to help his client is not only compelled by the specific facts in this record, and the lack of any fact from which to infer intent to abandon, neglect, or lack of concern, but is supported by the entire factual context. Respondent, an ordained clergyman, has devoted his professional life, if not his whole life, to attempting to help unfortunate Central American aliens charged with immigration violations. He lives among them, he works among them, he confines his legal practice to their problems, and, to all intents and purposes, works on a pro bono basis. These circumstances, of course, would not in any way excuse a violation of the Code; in our view, however, they certainly militate against a finding that respondent would intentionally abandon or neglect his clients.

■ In his commendable efforts to advance the position of the Commission, bar counsel suggests that in not entering an appearance at the immigration hearing, respondent may have failed to fulfill his obligations to that court. We do not reach any conclusions on that issue. First, the record before us does not establish that respondent acted improperly. There is evidence that respondent may, indeed, have informally notified the judge that he was not going to appear and may have explained the reasons for his decision. Transcript of Proceedings Before Disciplinary Committee 6G, Nov. 2, 1988, at 172. Second, and more important, respondent was not charged with any violation of his obligation to the immigration court. Respondent may not

---

3. We hasten to note that even if we were to deem respondent's conduct "negligent," most decisions and official ABA policy insist that a single instance of "ordinary negligence" is usually not a disciplinary violation. *See generally* C.W. WOLFRAM, MODERN LEGAL ETHICS at 190 n. 36 (1986) (citing ABA Informal Op. 1273 (1973) (DR 6–101(A)(3)) ("Neglect usually involves more than a single act or omission. Neglect cannot be found if the acts or omission complained of were inadvertent or the result of an error of judgment made in good faith"); *see*

*also Florida Bar v. Neale*, 384 So.2d 1264, 1265 (Fla.1980) (Where lawyer discovered theory upon which he might have obtained a larger recovery for his client but then made the mistake of dismissing the action, the court stated that "[t]here is a fine line between simple negligence by an attorney and violation [of Code] that should lead to discipline. The rights of clients should be zealously guarded by the bar, but care should be taken to avoid the use of disciplinary action ... as a substitute for what is essentially a malpractice action.").

**562**

be charged with one violation and then, without opportunity for hearing or presentation of evidence, be disciplined for another. *In re Riley*, 142 Ariz. 604, 609, 691 P.2d 695, 700 (1984). In *Riley*, we construed the United States Supreme Court opinion in *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), which held that a lawyer has the right to procedural due process in State Bar proceedings. Riley had been charged with a number of ethical violations. At his hearing, evidence was presented that indicated he had violated other ethical canons. The State Bar accordingly amended its complaint. We held such amendment did not violate procedural due process guaranteed in *Ruffalo* because respondent had ample time and opportunity to respond. In this case, no amended complaint was filed and respondent has not been given any opportunity to respond to the allegations of misconduct for which the dissent wishes to hold him responsible.

■ Bar counsel also suggests that respondent's behavior when he first defended himself against the charges filed with the State Bar was less than exemplary. We agree. Without in any way approving some of the language or methods respondent employed in his initial pro se defense against the charges, we think it obvious, however, that most of the improprieties can be attributed either to respondent's inexperience (especially in responding to the disciplinary process), or (and perhaps in a larger degree) to the emotions engendered by the political and moral controversy surrounding the immigration policies involving those seeking asylum from the troubles in Central America. Finally, we note on this point, as well, respondent was not charged with violating DR 7-106(C)(6), which states that a lawyer shall not "[e]ngage in undignified or discourteous conduct which is degrading to a tribunal," and believe his conduct did not rise to the level of a violation in any case. If anything, his conduct merely lends further support to the old adage that "a lawyer who represents himself...."

The dissent makes four points. First, it argues that respondent should not have denied he was the client's attorney. Dissent at 564, 795 P.2d at 207. Doing so "exhibited a lack of knowledge of the attorney-client relationship...." *Id.* Second, it argues that respondent should not have questioned the competence of the Committee. *Id.* at 564–566, 795 P.2d at 207–209. Third, it criticizes respondent's reliance "on an unsupported theory of conspiracy." *Id.* at 566, 795 P.2d at 209. These points all deal with respondent's conduct while he appeared pro se during the disciplinary proceedings.

The answer to this, of course, is that respondent has not been charged with any of these matters but only with three counts of having intentionally neglected his client's interests. In effect, the dissent argues that respondent may be charged with specified offenses and, despite the lack of evidence to support those charges, be found to have committed others that were neither charged nor the subject of any hearing. We reject such a proposition as failing to comport with elemental due process. *See Ruffalo.*

Finally, the dissent disagrees with a comment in this opinion regarding respondent's obligation to the immigration court. *See* dissent at 566, 795 P.2d at 209. No doubt this court could impose appropriate discipline on respondent if he had committed improprieties in his appearance before the United States Immigration Court. Before doing so, it would be necessary to charge him with such an offense and to provide him a hearing. *See Ruffalo.* No such charges were preferred and no such hearing was held. Lacking evidence taken at a hearing on a specified charge, we do not propose to determine whether respondent's conduct in immigration court was proper or improper.

CONCLUSION

We do not accept the Commission's recommendations. We find no clear and convincing evidence that respondent committed the offenses charged in the complaint. The Committee's recommendation is ap-

proved. Accordingly, the charges against respondent are dismissed.

GORDON, C.J., and MOELLER, J., concur.

CORCORAN, Justice, specially concurring:

Although I agree with the dissent that the record before us shows that respondent's conduct *may* have been questionable during these proceedings, I join in the conclusion reached by the majority that this record does not contain clear and convincing evidence that respondent committed the ethical violations with which he was charged. Absent this evidence, I agree that the complaint should be dismissed. I write separately, however, to express my concern with the procedural status of this case.

This matter arose from respondent's involvement with a client that began in July 1984—almost 6 years prior to our final resolution of these issues. The hearing at which respondent failed to appear occurred on September 19, 1984. The letter complaining of this conduct was not received by the state bar until nearly a year later. The probable cause panelist did not issue his finding of probable cause and informal reprimand until January 6, 1986. When respondent requested a formal proceeding, the panelist's order was vacated and the formal disciplinary complaint was filed. The first hearing committee met on March 25, 1987. The first disciplinary commission ruling was issued in October 1987; that ruling remanded the matter back to a second hearing committee, which did not hold a hearing until November 2, 1988. The commission met a second time to review the second committee's report on February 11, 1989. It ultimately reached the same conclusions as did the first hearing committee, recommending public censure. After that point, the matter eventually arrived for review in this court. The formal record in this case is one of the largest encountered to date.

I believe that the length of time this matter has been in the disciplinary system—more than 5 years—is directly related to the extensive use of volunteers in the system. Members of the hearing committees and the disciplinary commission are busy professionals with only sporadic availability to meet and consider these cases. As a result, these matters drag on for years with lengthy delays between procedural steps. I believe that it may be time for this court and the state bar to consider whether it has become necessary for the state bar to hire administrative law judges to hear evidence on an ongoing basis instead of relying on hearing committees that meet only occasionally. It may also be time for the bar to hire more full-time paid bar counsel, rather than rely on volunteer bar counsel with other professional obligations.

Additionally, I believe that the delay in this case results from a convoluted disciplinary process. Perhaps this system can be simplified. *See* American Bar Ass'n *Model Rules for Lawyer Disciplinary Enforcement* (August 1989).

I urge the bench and bar to consider resolving these problems to prevent unreasonably . long procedural delays like the ones that occurred in this case.

CAMERON, Justice, dissenting.

I regret that I must dissent. A reading of the record in this case indicates that there is a lack of the most basic knowledge of the lawyer-client relationship on the part of the respondent. In addition, his pleadings raise questions about his ability to properly represent his clients. Because respondent's motives are good, does not mean he need not measure up to the ethical standards of the legal profession. A lawyer must be competent before he is benevolent.

The matter is not difficult. Respondent on 19 July 1984 agreed to represent Abel Lucero–Lima accused of illegal entry. into the United States. Respondent at that time signed and filed a Form G–28 Notice of Entry of Appearance as an attorney or representative. There were no restrictions as to the scope of his representation. At the initial hearing, respondent not only ap-

peared but waived some of Lucero's rights. Respondent stated:

> Your honor, at this time we'd like to make a statement. We would like to concede service of the O.S.C., we would like to waive the readings of rights and explanations as required by law, we'd like to admit the allegations contained in the O.S.C., we will decline to designate a country of deportation at this time.

Respondent also made a motion for an extension of time stating:

> Abel Lucero Lima requests this court to extend the time for filing his petition for political asylum to August 6, 1984 from August 3, 1984. The reason for this request is that his attorney was unexpectedly called away on another matter, involving murder, and could not complete the form on time. This is being manifested to the court as the first possible moment after the date the form was due, and said form is being simultaneously submitted.
>
> WHEREFORE, Mr. Lucero requests this court to extend his filing deadline to August 6, 1984.

Later, respondent received a notice of hearing for his client. He made little effort to notify his client. Respondent intentionally did not appear at the hearing. In the absence of both respondent and Lucero, the immigration judge ordered Lucero deported. Lucero's case was appealed by another attorney and the court remanded for a new hearing because of inadequate representation by the respondent. As a result, the chief immigration judge wrote to the state bar stating:

> Your attention is invited to the fact that this case was remanded by the Board for further proceedings before the Immigration Judge because counsel for the respondent, whose name appears above, failed to notify his client of the time and place of a hearing on his asylum application. As a result, neither the alien nor his counsel was present at the hearing. The request for asylum was subsequently denied by the Immigration Judge and the alien's attorney had deprived his client of the opportunity to be heard.

What followed was a flurry of filings by the respondent, acting as his own attorney. These pleadings raise questions concerning his professionalism. First, he showed a lack of knowledge of the law in insisting Lucero was not his client. Respondent stated in one of his many pleadings:

> ARTICLE 11 (COUNT THREE): a) Mr. Lucero was never counsel's client. b) Mr. Lucero was in a better position as a result of Fr. Myers representation, rather than a worse position. Mr. Lucero gained at least twelve months of freedom from persecution. Counsel did not violate DR 7–101(A)(3). (Prejudice to Client).
>
> For Bar Counsel John G. Ryan to plead to the contrary either manifests gross ignorance of Immigration law and procedures, or constitutes perjury.

Respondent may not have it both ways. Either he represented Lucero or he did not. If he did represent Lucero then Lucero was respondent's client.

Second, respondent contends that the Hearing Committee was incompetent because the members of the Committee were not immigration specialists stating:

> 2. This committee has made conclusions of law with respect to immigration law. The chairman of this committee has admitted, on the record, that he knows very little about immigration law. I have practiced immigration law extensively and I have never encountered the other two members of this committee in the practice of immigration law. I therefore make a logical presumption that they, also, know very little about immigration law. ER 1.1 of the lawyer's Rules of Professional Conduct, and Canon 1 of the Code of Judicial Ethics state that a lawyer and judge must acquire and maintain professional competence in the areas in which they practice. Here the members of the Committee, one by his own admission, do not have the competence required to judge this case. Therefore they are bound to recuse themselves.

Respondent contends that because the commissioners were not versed in immigra-

.tion law, they didn't understand that it is normal for a lawyer not to show up at a regularly scheduled hearing without notice. To support this position, respondent called some expert witnesses and filed an affidavit. Their testimony does not support respondent's position, but just the opposite, refute his position. For example, the affidavit of Anne Pilsbury filed by respondent stated:

I, ANNE PILSBURY, being duly sworn do depose and say as follows:

1. I am an attorney licensed to practice law in the District of Columbia and the State of Maine and before various federal district courts, the Second Circuit and the District of Columbia Circuit as well as the U.S. Supreme Court. I have been active in the practice of law since 1975.

2. My background is in general federal civil litigation; however, for the past three and half years I have devoted myself exclusively to providing free legal assistance to Salvadoran and Guatemalan asylum seekers because there is a very grave shortage of attorneys and representatives to assist the large numbers of persons from those countries who are facing deportation proceedings.

3. I have appeared before the immigration judges in the New York City district in connection with over 100 individual cases. I am familiar with all areas of the asylum process as it effects Salvadoran and Guatemalan asylum seekers. I am also the director of a non-profit organization called Central American Legal Assistance located at 240 Hooper Street in Brooklyn, N.Y. 11211. This office tries to provide free legal representation to any Salvadoran or Guatemalan arrested by the INS and who fears persecution if returned to his or her home country.

\* \* \* \* \* \*

6. Because Father David Myers covers the INS detention center, a service that the private bar has never undertaken to do in any part of the country of which I am aware, he comes in contact with a large number of indigent, unrep-resented aliens who need help. We have often had the experience here of representing someone in a bond reduction hearing while they are in detention (during which time they may be served with an Order to Show Cause) and then losing track of them after they are bonded out. Although we make every effort to maintain contact, the difficulty many refugees have finding housing and support often means that they will have to change addresses frequently and we will have to write several letters to locate them.

7. It occasionally happens that despite our best efforts we are not able to locate a client who has received a hearing notice which we are aware of because either someone in the office was the obligor of the bond (and by regulation had to be told of the hearing) or because INS sent us a copy of the hearing notice. *When this happens it is my practice and the practice of other experienced attorneys and representatives to inform the court by telephone or letter if there is time that we cannot locate the client but I do not go to court to the hearing without my client.* That would serve no useful purpose and given the enormous caseload we carry would greatly prejudice my ability to serve the majority of clients with whom I am in contact.

\* \* \* \* \* \*

(Emphasis added.)

Immigration judge McCarrick testified:

Q. Lastly, Judge McCarrick to appear— I'm going to seek your opinion here—if another lawyer handled the bond aspect of a case, actually setting forth, effectuating the bond, and if this was done prior to the date of the hearing set forth—as an example, in Exhibit B–4, the notice of hearing, which I believe is the proper entitlement of this documentation— would a lawyer be ethically required, in your opinion, to have to appear at the hearing set forth there?

\* \* \* \* \* \*

THE WITNESS: I can't answer that simply yes or no. I've got to give you

some further history. There was a time when attorneys attempted to make limited appearances for bond purposes only, and very often the G–28 would reflect appearance for bond only. As a practical matter, some courts did and some courts did not honor that limited appearance.

I think you'll find the regulations now provide there are no limited appearances, but again, that's only subsequent to 1987. In my view, my personal practice prior to 1987 was that if an individual indicated that they were making a limited appearance on the G–28, they were essentially—they essentially stated that they were only coming in for a limited purpose, and as such, in my view I would honor that request.

*    *    *    *    *    *

It is noted that the complaint to the Arizona Bar was made by the chief immigration judge who, it is presumed, "knows something about immigration law."

Third, in defense of his actions, respondent relies heavily on an unsupported theory of conspiracy. Respondent stated in the pleading:

> Let it be clearly stated from the outset that David A. Myers, the respondent, believes this entire action to be brought for the purpose of harassing him because of his devoted service to Central American refugees. It is part of a conspiracy to harass attorneys advocating causes considered undesirable by President Ronald Reagan, Attorney General Edwin Meese III, and Chief Immigration Judge William R. Robie. Unfortunately, the Supreme Court of Arizona, through the State Bar of Arizona, Disciplinary Commission, has become complicit in the conspiracy.
> Counsel for Mr. Robie does not address the substantive issues of Fr. Myers' Answer: 1) the entire action is nothing but a political ploy on behalf of Mr. Robie to harass and discredit Fr. Myers in his work for Central Americans. 2) the person it is alleged was injured by Fr. Myers, a) is not a party to the complaint, b) was never a client of David Myers, and c) the only legal issues involved are

highly debatable, and should be litigated in the federal court, not the Supreme Court of Arizona Disciplinary Commission. 4) the Board of immigration Appeals found Immigration Judge John T. Zastrow to have erred, not Fr. Myers. 5) the Complaint in this case contains gross misrepresentations of the facts in critical matters, which reflects either manifest incompetence or perjury on the part of Mr. Ryan.

As part of this theory, respondent alleged that the bar counsel's copy of the letter of complaint by Judge Robie contains a hand-written note. Respondent stated:

> His Exhibit L includes a notation, not on the originals, as presented to Respondent. In the upper right quadrant of William R. Robie's letter of complaint is hand written what appears to be "Screw David Myers VGa 9/9/85." This accurately states the apparent motivation behind this action.

A careful (or even not so careful) reading of this notation indicates that it reads "screen David Myers."

Respondent further alleges:

> The Respondent has even maintained that the purpose of the action itself is to harass him because of his service to Central American refugees, and thus to occupy his time in his defense of himself in the bar committee, which time would otherwise be spent in helping Central American refugees.

I disagree. I find no evidence of a conspiracy to prevent respondent from representing his clients.

Finally, I must respectfully disagree with the statement in the majority opinion which reads as follows:

> [R]espondent was not charged with any violation of his obligation to the immigration court. Respondent may not be charged with one violation and then, without opportunity for hearing or presentation of evidence, be disciplined for another ...

Respondent was charged with the following violations of the Code of Professional

Responsibility, DR–6–101(A)(3), which reads:

(A) A lawyer shall not:

\* \* \* \* \* \*

(3) Neglect a legal matter entrusted to him.

And DR 7–101(A)(1), and DR 7–101(A)(3) which read:

(A) A lawyer shall not intentionally:

(1) Fail to seek the lawful objective of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7–102(B).

\* \* \* \* \* \*

These charges applied to respondent regardless of whether the conduct occurred before the Immigration Court, a state court or any other court, state or federal. There was no confusion for respondent as to what the charges were, as his pleadings indicate. There was no due process violation. *In re Riley,* cited by the majority does not apply. *Riley, supra,* was a question concerning an amendment of a complaint after the hearing had started. We stated that allowing amendments is constitutional as long as care is taken to assure that respondent has a reasonable time and an appropriate opportunity to respond to the additional charge. *In re Riley,* 142 Ariz. 604, 609, 691 P.2d at 695 (1984). In the instant case, the respondent knew of this allegation of failure to properly represent his client (Lucero) and he had ample time to prepare his defense.

I would adopt the recommendation of the Commission.