In re **VANDERBILT ASSOCIATES, LTD.,** a Utah limited partnership, Debtor in Possession.

In re **SANDAL RIDGE ASSOCIATES,** a Utah limited partnership, Debtor in Possession.

**Bankruptcy Nos. 89B–02556, 89B–04314.**

United States Bankruptcy Court, D. Utah, C.D.

Jan. 31, 1990.

Noel S. Hyde, and Chris L. Schmutz, of Nielsen & Senior, Salt Lake City, Utah, for Vanderbilt Associates and Sandal Ridge Associates, debtors in possession.

## MEMORANDUM DECISION

JUDITH A. BOULDEN, Bankruptcy Judge.

The motions for approval of the employment of the law firm of Nielsen & Senior (Law Firm) to represent the limited partnership debtors in each of these Chapter 11 cases came on for hearing unopposed. Despite the lack of opposition, the court denied each of the motions. The court found that simultaneous representation by the Law Firm of both debtors, which have a common general partner, constituted an actual interest adverse to each of the estates as set forth in section 327(a) and that such adverse interest prohibited employment in both cases. The court reserved the right to supplement its bench ruling with a written memorandum, which it now does. For the purpose of economy, this memorandum references both cases.

## BACKGROUND

Vanderbilt Associates, Ltd. (Vanderbilt) and Sandal Ridge Associates (Sandal Ridge) filed petitions for relief under Chapter 11 on April 26, 1989, and July 18, 1989, respectively. Both entities are limited partnerships having as their general partner Clark Financial Corporation (Clark Financial). Both entities maintain the same mailing address in Salt Lake City, Utah, and are managed by Property Management Service, an affiliate of Clark Financial. Both petitions, as well as the motions for appointment, were executed by Spence Clark, president and CEO of Clark Financial. Sandal Ridge listed Spence Clark as an additional general partner on its statement of affairs.

Vanderbilt commenced business in 1985 and was engaged in the operation of the Vanderbilt Apartments in Fort Worth, Texas. The schedules listed assets valued at $7,030,000 and liabilities of approximately $10,941,402 including $108,940 in unsecured creditors' claims. PMS–Pooled Income, located at the same Salt Lake City, Utah, address as Vanderbilt, was listed as the largest unsecured creditor with a claim for services in the amount of $100,000.

Shortly after filing, creditors, who asserted an ownership interest in the Vanderbilt Apartments and a leasehold interest in the real property upon which the Vanderbilt Apartments are located, filed a motion for relief from automatic stay pursuant to 11 U.S.C. § 362(d).[1] The motion alleged that Vanderbilt had defaulted in certain payments and that demand had been made upon Vanderbilt to cure the default through its general partner Clark Financial. The default allegedly resulted in the improvements situated on the land automatically vesting in the creditors immediately prior to Vanderbilt's filing. They further claimed that cause existed to lift the automatic stay because of the alleged transfer, on the day of filing, to Clark Financial or other affiliated entities, of certain Vanderbilt's assets. After notice and a hearing, this court granted the motion for relief from the automatic stay.[2] The ruling has since been appealed and affirmed.

Sandal Ridge commenced business in 1982 and was engaged in the operation of the Sandal Ridge Apartments in Mesa, Arizona. The schedules listed assets valued at $4,010,000[3] and liabilities of approximately $4,675,536, including $417,293 in unsecured creditors' claims. CFC–Pooled Inc. Fund I and CFC–Pooled Income, both located at the same Salt Lake City, Utah, address as Sandal Ridge, were listed as unsecured creditors with alleged claims for notes payable of $354,900.[4]

Shortly after filing, the second lien holder of the Sandal Ridge Apartments moved for relief from the automatic stay asserting it was not adequately protected, that Sandal Ridge had no equity in the real property, and that the property was not necessary to an effective reorganization which was in prospect. The real property was in the possession of the creditor as of the date of filing. After notice and a hearing, this court granted the motion to terminate the automatic stay.[5] The ruling has since been appealed and is pending before the District Court.

The Law Firm moved pursuant to section 327(a)[6] for an order of this court approving its employment to represent each of the limited partnerships. Notice of the motions was given to what apparently represents the twenty largest unsecured creditors in each case, as well as the United

---

1. All future references are to Title 11 of the United States Code unless otherwise noted.

2. The court ruled the improvements located upon the real property had vested in the creditor prior to filing as the result of an uncured default in the ground lease. Vanderbilt was also six months delinquent on a related trust deed note. The court refused to recharacterize the ground lease as a security agreement. The court found that the possessory, as opposed to legal, interest of Vanderbilt in the improvements was an insufficient property interest upon which to structure a reorganization which was in prospect. Because the foregoing was sufficient basis for the court to grant the creditors' motion, the court did not address the issues raised as a result of the alleged transfer of $194,526 by Vanderbilt to Clark Financial, or other affiliated entities, on the same day as the filing of the petition.

3. The schedules valued the Sandal Ridge Apartments at $4,000,000. That value was reduced by stipulation to $3,700,000.

4. These "creditors" apparently do not represent entities but instead bank accounts or funds controlled directly or indirectly by Clark Financial or its affiliates. The claims are designated as "insider" claims in Sandal Ridge's disclosure statement.

5. The court ruled that Sandal Ridge had no equity in, and did not possess the real property as of the date of filing. The financial data indicated that income from the property was insufficient to meet operating expenses as well as service debt senior to the movant. The court found Sandal Ridge's projections of future income and expenses to be unrealistic. The potential to raise capital from existing equity security holders was impracticable given the financial condition of Sandal Ridge. Therefore, the court ruled that the property was not necessary to an effective reorganization which was in prospect.

6. 11 U.S.C. § 327(a) provides:
 **§ 327. Employment of professional persons.**
 (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

States trustee. It is unclear whether the equity security holders of the debtors were notified of the motions, the hearing, or even of the chapter 11 filings.[7] No party in interest objected.

Attorneys for the Law Firm executed affidavits or verified statements as required by Bankruptcy Rule 2014(a) and section 327(a). They disclosed that the Law Firm had been paid a $5,000 retainer in each case. Both affidavits reflected that the Law Firm represented the within limited partnerships, as well as the following entities which were or had been under the jurisdiction of this court: Dobson Village North, Ltd.; Reddington/Casas Adobes; Reddington/Park Santa Fe; and Reddington/Willow Creek. All of these entities have Clark Financial or its affiliate, Value Management Corporation, as their general partner. Clark Financial is represented by independent counsel and not by the Law Firm. Each affidavit states that neither of the partnerships owe any obligations to or hold any adverse relationships with any of the other partnerships. The affidavits do not analyze or disclose any potential claims each debtor may have against any entity, including Clark Financial or Spence Clark.

Both debtors have filed disclosure statements and plans, though neither disclosure statement has yet been approved by the court. While each disclosure statement and plan is unique as to each debtor, they contain certain fundamental similarities. Both debtors propose to retain their real property. Debt service would occur from revenue generated from their oversecured

properties and from capital contributions raised from their limited partners. Vanderbilt's limited partners could contribute up to $500,000 in cash needed to fund its plan. Sandal Ridge's limited partners could contribute up to $600,000.[8] Both plans indicate that if sufficient equity contributions cannot be raised from the limited partners, Clark Financial would be required to contribute the funding necessary for each of the plans. The potential combined contribution from Clark Financial totals $1.1 Million. Sandal Ridge's plan did not propose any contribution from Spence Clark, its other general partner. Clark Financial or its affiliate Property Management Services would continue to manage each reorganized debtor for a 5% fee.[9]

## DISCUSSION

### A. Jurisdiction

■ This court has jurisdiction over these cases pursuant to 28 U.S.C. § 1334(a) and 28 U.S.C. § 157(a). The issue raised by these motions for employment of professional persons are matters concerning the administration of these estates and are within the core of this court's jurisdiction.[10]

### B. Issue Presented

The issue presented by these motions is whether one law firm simultaneously representing the interests of two insolvent chapter 11 limited partnerships with a common general partner, constitutes representation which is adverse to each of the estates such as to prohibit employment. A brief review of the law of conflicts of interest is helpful.

---

7. Since neither debtor filed a list of equity security holders pursuant to Bankruptcy Rule 1007(a)(3), it is unclear whether they are contained in the matrix of parties in interest or were given notice. The mailing matrix in Sandal Ridge appears to contain a list of individuals who may be limited partners, although they are not so designated. The mailing certificates for the notice of hearing on the motions does not indicate that any entity identifiable as an equity security holder received notice.

8. The securities would be marketed by Clark Securities Network, an affiliate of Clark Financial.

9. Vanderbilt's unsecured creditors with claims over $5,000 would receive 10% of their claims plus interest over time. Unsecured claims in an amount less than $5,000 would be paid in full. Sandal Ridge's unsecured creditors with claims in an amount less than $3,500 would be paid in full. Other unsecured creditors would share pro rata in $100,000 by the second anniversary of the effective date, with the balance paid on the tenth anniversary of the effective date. Sandal Ridge's disclosure statement anticipated payment of fees and expenses incurred by Clark Financial as administrative expenses.

10. 28 U.S.C. § 157(b)(2)(A).

## C. Conflicts of Interest

### In General

Ethical standards for attorneys appearing before this court are found in the Rules of Professional Conduct (Rules) adopted by the Utah Supreme Court January 1, 1988, and the Code of Professional Responsibility (Code) approved by the Judicial Conference of the United States.[11] Rule 1.7 of the Rules [12] and DR 5–105 of the Code [13] are the sections which regulate conflicts of interest in situations involving representation of multiple clients. The court looks to these rules for guidance in these cases.

An analysis of conflicts of interest must begin with the premise that debtors should be free to select counsel of their choice. *In re Roberts,* 75 B.R. 402, 406 (D.Utah 1987). Failure of the court to appoint an attorney chosen by a debtor deprives the debtor of representation and usually entails additional expense and delay. This general principal is tempered by ethical restraints placed upon attorneys by the Rules and the Code. It is also modified and controlled by statutory restrictions contained in the Bankruptcy Code which prohibit the attorney from representing an interest materially adverse to the estate.

Two broad principles underlie all rules regulating conflicts of interest; that of loyalty and of confidentiality. Loyalty con-

**11.** Rule 1(g) of the *Civil Rules of Practice of the United States District Court for the District of Utah* and Rule 1(g) of the *Local Rules for the United States Bankruptcy Court for the District of Utah* make these two sets of disciplinary and ethical rules applicable in this court. Some confusion however, exists over the extent to which the Code of Professional Responsibility has been expressly adopted by the Judicial Conference. After reviewing the reports of the Judicial Conference, it appears that while some effort was made by the ABA to secure the Conference's adoption of the Code of Professional Responsibility for use in the federal courts, the Conference declined to take such action. Rather, the Conference

noted the promulgation of the new ABA Code, and recommend[ed] that district and circuit courts review their local rules in light of the new Code, noting, however, the report of the Administrative Office as to those portions of the Code which may differ from Conference-approved policy.

1970 *Report of the Proceedings of the Judicial Conference of the United States* 14 (March 16, 1970).

**12. Rule 1.7 Conflict of Interest: General Rule**

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) Each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person or by the lawyer's own interest, unless:

(1) The lawyer reasonably believes the representation will not be adversely affected; and

(2) Each client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation to each client of the implications of the common representation and the advantages and risks involved.

(c) A lawyer shall not simultaneously represent the interests of adverse parties in separate matters, unless:

(1) The lawyer reasonably believes the representation of each will not be adversely affected; and

(2) Each client consents after consultation.

**13. DR 5–105 Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.**

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(D) If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.

notes that the lawyer must be in such a position that all options which might favor the client can be considered and that the lawyer's full expertise and energy can be devoted to the client's problems. Such service must be free from the advocacy or influence of any interest other than those of the client. Confidentiality requires that a client be free to divulge all information which a fully informed lawyer would wish to have in order to assess the client's legal position. The client must be able to give assistance to the lawyer free from the fear that the attorney may use the information against the client in favor of the lawyer's other clients. To test if a conflict exists, the proper criterion is whether there is a reasonable probability that one or both of these principles will be seriously impaired.[14]

### Protected Class

The duty owed by an attorney to represent a client free from adverse outside interest is for the benefit of and protects the client.[15] When a debtor in possession in bankruptcy is represented, it is the estate that is the protected party. Equity interest holders, creditors, or other parties in interest are represented by separate counsel. An additional protected party in a bankruptcy context is the public in general and its perceptions of our legal system.[16] In bankruptcy, unlike traditional two-party litigation,[17] many parties in interest are unrepresented. They rely on statutory compliance to ensure fair administration of their interests. To that end, Congress placed specific restrictions upon the employment of professional persons and made this court much more active in the regulation of attorneys than is customary in other courts.

### Consent

If a conflict of interest is perceived on the ground of either loyalty or confidentiality, it may represent an impermissible conflict. The Rules and Code provide however that the client may be able to relinquish its right to a conflict-free representation if the client is fully informed. Consent should be viewed with circumspection and only in the context of the specific client.

Even if perfectly well informed clients can be assumed, it does not invariably follow that it should be one of freedom's proudest boasts that a client should be able to commit selfevisceration in the

---

**14.** Wolfram, *Modern Legal Ethics* § 7.1.3 (1986).

**15.** Isolation of what constitutes the "client" is a precursor to this analysis. In the case of an individual, the identity of the protected entity is apparent. In the case of a corporation, the duty is owed to the corporate entity itself, not to the board of directors or to any specific shareholder. In the case of a limited partnership the duty is also owed to the entity and not to the general partner, even though the survival of the general partner may impact on the survival of the limited partnership.

**16.** This concept is generally expressed as the appearance of professional impropriety standard. The Rules of Professional Conduct abandoned this broad concept found in the 1969 Code of Professional Responsibility for more detailed and specific prohibitions. However, in a bankruptcy context the prohibition of the appearance of conflicting interests, as well as the prevention of actual conflicting interests, becomes critical to the public's perception of the fairness of our system.

**17.** Much of the case law surrounding conflicts of interest has developed regarding coparties in litigation. *See e.g., Estates Theatres, Inc., v. Columbia Pictures Indus., Inc.,* 345 F.Supp. 93 (S.D.N.Y.1972). Often courts have shown greater tolerance of nonlitigation conflicts because it is generally less disruptive to stop the joint representation and continue with separate representations. Even in nonlitigation matters however, business transactions may present irreconcilable conflicts.

> For the most part, at least while prosperity smiles, the interest of a corporation and its constituencies can appear to be in happy agreement ... But frequently the tranquility that pervades when cooperative wills are bent toward the achievement of common goals is shattered when the corporation or stock in it is sold, when a principal officer leaves the corporation, when a shareholder derivative action is brought against the corporation and its officers and directors, or when a lawyer who has represented the corporation or its officers and directors now appears against the interest of one of them.

Wolfram § 8.3.1. In a bankruptcy context the nature of the representation is both transactional and adversarial. All representation however, is under the supervision of the court. What may be considered appropriate tolerance of conflicts of interest in a setting divorced from the oversight of the court, becomes the sanction of inappropriate conduct in these circumstances.

course of a legal representation. It is true that American constitutional liberties proceed on the highly individualistic theory that the 'respect for the individual is the lifeblood of the law.' But respect for incompetent clients and those pressed into illadvised acquiescence by the force of economics or the influence of a disadvantageous bargaining environment does not require that asserted consents be universally honored.

Wolfram § 7.2.2.

Consent is based on the premise that full disclosure is given to the client.[18] The client must also have the capacity to consent. The extraordinary fiduciary responsibilities of persons functioning as trustees of an express trust and in analogous positions might make unacceptable a trustee's consent to the risk of a conflicting representation. Shipman, *Professional Responsibilities of the Corporations Lawyer in Professional Responsibility: A Guide for Attorneys* 280 (1978); *ABA Comm. on Ethics and Professional Responsibility,* Informal Op. 564 (1962). If the people who actually make the decision to consent are the same individuals whose interests are in conflict, that consent is suspect. *See Messing v. FDI, Inc.,* 439 F.Supp. 776 (D.N.J. 1977). The fiduciary responsibility imposed by the Bankruptcy Code upon a debtor in possession makes consent to conflicts of interest generally inconsistent with the debtor's duties. Exceptions however, may be allowed in close corporations where a reorganization is contemplated and no actual conflict exists. *Roberts,* 75 B.R. at 405; *but see In re Kendavis Indus. Int'l, Inc.,*

91 B.R. 742 (Bankr.N.D.Tex.1988). The exception, however, should not consume the rule.

## D. Adverse Interest and Disinterested Standards

The Appointment Process

 The Rules and the Code are merely the starting points in providing guidance in the analysis of conflicts of interest in a bankruptcy context. Counsel representing debtors in possession have a duty to search for potential conflicts affecting loyalty and confidentiality, to disclose the same, and to seriously analyze whether consent to a conflict can be given by the client. It is the Law Firm's burden to prove to the court that they are eligible for employment. *Bodily,* 649 F.Supp. at 475 n. 13. Even though no party in interest has objected, it is incumbent upon the court to make an independent determination if appointment is appropriate.[19] The mere absence of objection is certainly not controlling, especially as in this case, if those affected have not received notice.

 The appointment process required by section 327 and Bankruptcy Rule 2014 is designed to bring to the court's attention at the inception of the case any relationship of counsel which would serve to give the estate less than the benefit of full independent legal advice. The attorney may not hold or represent an interest adverse to the estate and must be disinterested. In *In re Roberts,* 46 B.R. 815 (Bankr.D.Utah 1985) the court explained what constitutes hold-

---

**18.** Consent cannot be effective unless the attorney explains the nature and implications of the conflict in enough detail so that the parties can understand why independent counsel may be desirable.

> For client consent to be adequate in a conflict of interest situation, the attorney must not only inform both parties that he is undertaking to represent them, but must also explain the nature and implications of the conflict in enough detail so that the parties can understand why independent counsel may be desirable.

*Bodily v. Intermountain Health Care Corp.,* 649 F.Supp. 468, 475 (D.Utah 1986) (quoting *Margu-*

*lies v. Upchurch,* 696 P.2d 1195, 1203–04 (Utah 1985)).

**19.** Some courts have allowed appointment where a potential conflict exists and if an actual conflict arises, have dealt with the problem by the denial of compensation and reimbursement of expenses. *In re Stamford Color Photo, Inc.,* 98 B.R. 135, 138 n. 1 (Bankr.D.Conn.1989). This court feels strongly that counsel should not be lead down the path of anticipated compensation if the court foresees the substantial likelihood of a conflict that would preclude compensation. The issue is more fairly resolved early in the case.

ing or representing an adverse interest.[20] "Disinterested" is defined by 11 U.S.C. § 101(13).[21] In order for the court and parties in interest to determine if an attorney holds an adverse interest or is disinterested, Bankruptcy Rule 2014(a) requires a verified statement of the applicant's connections with any party in interest. That affidavit must thoroughly disclose all connections with the debtor, creditors, or any other party in interest, and must be factual rather than conclusory. *United States v. Azevedo (In re Azevedo)*, 92 B.R. 910 (Bankr.E.D.Cal.1988). Even though the Law Firm in good faith thinks it qualifies to represent the debtor, that belief must be sustained by an objective standard.[22] It is the Law Firm's burden to convince the court that it is eligible for employment.

### Nature of the Representation

■ Analysis of the Law Firm's eligibility must be made in relation to the nature of the clients it seeks to represent and those clients' responsibilities which may be unique to bankruptcy. Each limited partnership debtor is a fiduciary having all the rights and powers of a trustee while conversely charged with performing all the functions and duties associated therewith.[23] As a trustee, each debtor must function in the best interest of its creditors, be accountable for all property of the estate, and should exercise such care and caution as would maximize the payment of creditors. As trustees, the debtors must also analyze any claims for relief allowed under the Bankruptcy Code which are the property of and which may enhance the estate, whether those claims are against the debtors' general partner or others. If the debtors choose not to exercise any trustee avoiding powers the rationale for that position must be consistent with responsible management of the estate's assets.

---

20. To 'hold an adverse interest' means for two or more entities (1) to possess or assert mutually exclusive claims to the same economic interest, thus creating either an actual or potential dispute between the rival claimants as to which, if any, of them the disputed right or title to the interest in question attaches under valid and applicable law; or (2) to possess a predisposition or interest under circumstances that render such a bias in favor of or against one of the entities.

To 'hold an interest adverse to the estate' means (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

To 'represent an adverse interest' means to serve as agent or attorney for any individual or entity holding such an adverse interest. In the case of *In re Harry Fondiller* [15 B.R. 890 (9th Cir.BAP 1981)] the court stated:

We interpret that part of § 327(a) which reads that attorneys for the trustee may "not hold or represent an interest adverse to the estate" to mean that the attorney must not represent an adverse interest relating to the services which are to be performed by that attorney.

*Roberts*, 46 B.R. at 826–27.

21. 11 U.S.C. § 101(13) defines "disinterested" as:
(13) "disinterested person" means person that—
(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not an investment banker for any outstanding security of the debtor;
(C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor;
(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and
(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason....

22. DR 5–105(C) indicates that one of the two exceptions to concurrent representation of adverse interests is where it is obvious that the representation of multiple clients can be adequately accomplished. "Without belaboring the point, we think 'obvious' must refer to an objective standard under which the ability of the attorney adequately to represent each client is free from substantial doubt." *Unified Sewerage Agency, Etc. v. Jelco, Inc.*, 646 F.2d 1339, 1348 n. 12 (9th Cir.1981).

23. § 1107(a).

If each debtor intends to propose a plan of reorganization it must have a disclosure statement approved which includes an analysis of the liquidation value of the assets of the estate if converted to a chapter 7.[24] Property of the estate as delineated in section 541(a)(3) includes any interest in property that the trustee recovers under section 723. Section 723 provides as follows:

(a) If there is a deficiency of property of the estate to pay in full all claims which are allowed in a case under this chapter concerning a partnership and with respect to which a general partner of the partnership is personally liable, the trustee shall have a claim against such general partner for the full amount of the deficiency.

(b) To the extent practicable, the trustee shall first seek recovery of such deficiency from any general partner in such partnership that is not a debtor in a case under this title. Pending determination of such deficiency, the court may order any such partner to provide the estate with indemnity for, or assurance of payment of, any deficiency recoverable from such partner, or not to dispose of property.

Given the statutory responsibility of the debtors, the conflicts analysis employed by counsel must be a two step process. Counsel must first establish whether or not each debtor's claim against the general partner for the full amount of any existing deficiency or for any of the trustee avoiding powers presents an actual conflict between partnerships with a common general partner. The Law Firm must then establish whether or not the general partner's self-interest taints its management decisions for each of the limited partners so that each debtor requires the protection of independent counsel. Such independence is required to ensure that the duties of loyalty and confidentiality owed by an attorney to each client are not breached.

Interests Materially Adverse to the Estate

For the sake of this analysis, the presumption must be made that each of the general partners is unable or unwilling to resolve each debtor's financial problems absent the protection of the Bankruptcy Code. Both of these estates are insolvent, thus they both possess and may assert a claim for contribution to the same economic interest, Clark Financial.[25] These claims may or may not be mutually exclusive.

The answer is determined by whether Clark Financial has sufficient assets to service all but the nonrecourse debt of its various limited partnerships, specifically the six which have sought relief in this court. There is no evidence before the court to indicate that either of the general partners of these debtors is insolvent. However, neither of the debtors' plans indicate the general partners desire to satisfy the obligations of these debtors except as a last resort. If a decision is made to assert a claim against Clark Financial by one debtor, that election will reduce the assets of Clark Financial which are available to service the remaining debtor in a like manner.

The situation is analogous to the representation of two creditors entitled to collect against the same judgment debtor. "There are situations in which a lawyer will have a conflict of interest when the lawyer prefers one client over another client in collecting assets from a common debtor." *In re Griffith*, 304 Or. 575, 748 P.2d 86, 101 (1987). Thus, an actual conflict arises because speed, litigation tactics, or diligence on behalf of one client may deplete the assets available for the remaining client to its detriment. *Matter of Pappas*, 159 Ariz. 516, 525–26, 768 P.2d 1161, 1170–71 (1988).

This conflict also manifests itself in another situation. Each debtor must determine if it is entitled to exercise any trustee avoiding powers to enhance its estate.[26] If those avoiding powers enable one debtor to

---

**24.** § 1129(a)(7)(A)(ii).

**25.** In the case of Sandal Ridge, Spence Clark would also be a target under section 723.

**26.** In Vanderbilt a preference to the general partner was alleged by creditors.

recover from Clark Financial, the total assets of Clark Financial may be diminished to the detriment of the other estate. If neither debtor chooses to exercise any of the trustee's avoiding powers because to do so may injure Clark Financial, each debtor may be violating its fiduciary responsibility to maximize the estate for the benefit of creditors.

In these cases, each debtor lists as substantial unsecured creditors certain pooled accounts apparently managed by or affiliated with Clark Financial. If these accounts represent insider claims the Law Firm must determine whether equitable subordination or other claim treatment is appropriate. Allowance or disallowance of the claims affects how much either the limited partners, or alternatively, Clark Financial must raise to fund the plan. Such a decision may either increase or decrease the assets of Clark Financial as the common debtor of both limited partnerships.

In defense, the Law Firm may assert that neither debtor intends to assert any claim against Clark Financial although the disclosure statements do not support that argument. The decision not to assess Clark Financial presupposes that each debtor has received legal advise which fully and without bias explores each debtor's legal rights and obligations as a fiduciary, without consideration of the consequences to the remaining client.

It is impossible for the Law Firm to give such advice. The duty of loyalty would be violated because the Law Firm could not help but consider the effect which one debtor's decision to assert a claim against Clark Financial would have upon the other debtor. Such consideration would not be free from the advocacy or influence of the interest of the second client.

The duty of confidentiality would be violated because the same Law Firm knows of the financial strategy for rehabilitation of each debtor. The desperate financial situation of one debtor may influence the degree of aggressive advocacy of the Law Firm on that debtor's behalf which may impact on the strategy of the remaining case. While in some professions a "Chinese Wall" may be employed to prevent such conflicts, in these cases with the same attorneys working for each debtor, that alternative simply is not a viable option.

Conflict in Management Decisions

The unique relationship between general partner and limited partnership requires that any decisions made by the general partner be made for the good of the limited partnership, and not for the self-serving purposes of the general partner. Any influence from management which conflicts with the best interest or fiduciary obligations of the debtor cannot be accepted. It is all too easy for an attorney to drift into a relationship with management who is restructuring the debtor which may be entirely adverse to the interest of the debtor in possession.

To make the Court's holding more concrete, the Court holds that whenever counsel for a debtor corporation has any agreement, express or implied, with management or a director of the debtor, or with a shareholder, or with any control party, to protect the interest of that party, counsel holds a conflict. That conflict is not potential, it is actual, and it arises the date that representation commences. This holding would apply equally to partnerships. An attorney who claims to represent a partnership, but also has some agreement, whether express or implied, with the general or limited partners, or with any control person, to protect its interest, that attorney has an actual conflict of interest, and is subject to disqualification and a disallowance of fees. The concept of *potential* conflicts is a contradiction in terms. Once there is a conflict, it is *actual—not potential.* (Emphasis in original). *Kendavis Indus.*, 91 B.R. at 754.

It is often the management of the general partner which may have contributed to the negative financial circumstances of the debtor. There is an inherent tension in the relationship between a non-debtor general partner and a debtor limited partnership. Because of his fiduciary duties, a general partner of a limited partnership will always be a potential target of claims by a limited partnership debtor. A general

partner is responsible for the day to day affairs of the business, and makes the policy decisions that lead to the financial problems that result in bankruptcy. This may involve a breach of fiduciary duty or securities law violations. The general partners may have received preferential or fraudulent transfers, or have received property of the estate. In addition, a general partner may have given a guaranty of the partnership debts. Counsel for the debtor will likely be required to examine the relations between the partnership and its general partners for possible claims against them.

*In re McKinney Ranch Assoc.*, 62 B.R. 249, 255 (Bankr.C.D.Cal.1986).[27] *But see Andrew v. Coopersmith (In re Downtown Inv. Club III)*, 89 B.R. 59 (9th Cir.BAP 1988).

Clark Financial is represented by different counsel from the Law Firm. These debtors arguably have legal counsel free from the influence of the general partner, however, each debtor must ensure that management decisions made for it are in its own best interest and not for some group plan or common design.[28] The method used to ensure the advocacy of each debtor's best interests independent from a global solution to the problems of a general partner is by the retention of independent counsel.

### Waiver

If the Law Firm, representing multiple adverse interests, intends the disclosure provided by Rule 2014(a) and the motion for appointment executed by the debtor to constitute consent to representation of multiple entities so as to satisfy Rule 1.7 or DR 5–105(C), that disclosure must be more than the mere enumeration of the different clients represented.[29] Consent can only be

**27.** This decision analyzes the mandatory disqualification of an attorney representing both a debtor partnership and its general partners. The conflicts, however, remain the same.

**28.** Both debtors propose in their plans to retain Property Management Services to manage the reorganized debtors for a 5% fee. Retention of an affiliate of Clark Financial may be sound business judgment. It also may not be. Such a relationship places each entity in a debtor-creditor relationship with the affiliate which may cause further conflict. If one debtor fails to pay its bills, that conduct may adversely impact on Property Management Services generally, to the detriment of its remaining clientele.

**29.** Analysis of conflicting claims of insiders and affiliates can be made only after a thoughtful tracing of the conduct and relationship of each entity. That tracing ought to be available to support the assertion that an attorney is eligible for employment. Professor Elizabeth Warren of the University of Pennsylvania School of Law advocated that a schedule similar to the one below should accompany all applications for appointment of counsel for chapter 11 corporate, partnership, and joint-venture debtors in a recent presentation prepared for the Federal Judicial Center, Workshop for Bankruptcy Judges of the 8th, 9th and 10th Judicial Circuits on December 4, 1989.

1. Does the debtor have any affiliates, defined under 11 U.S.C. § 101(2)? If yes, list the affiliate(s) and explain the ownership or control relationship between the debtor and the affiliate(s). If no, do not answer the remainder of this schedule. [Note that "affiliate" includes any entity or individual who directly or indirectly owns, controls, or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor.]

2. Has any affiliate ever filed for bankruptcy? If yes, list the affiliate(s) and the date and court of the bankruptcy filing. If any affiliate files after this schedule is filed, debtor's counsel must amend this schedule and notice all creditors.

3. Has any affiliate guaranteed any debt of the debtor or has the debtor guaranteed any debt of any affiliate? If yes, list the name of the affiliate, the amount of the guarantee, the date the guarantee was made, the identity of the creditor receiving the guarantee, and whether any security interest was given by the debtor or the affiliate to secure the guarantee. Give this information for every guarantee outstanding at the time of the debtor's bankruptcy filing, and every guarantee outstanding within 18 months before filing.

4. Has any affiliate extended credit, received credit, or otherwise established a debtor-creditor relationship with the debtor corporation? If yes, list the name of the affiliate, the amount of the loan, when the loan was made, what repayments have been made on the loan, and whether any security interest was involved in the loan. Give this information for all loans that have been made and fully paid off within 18 months preceding this filing and to any loans outstanding at the time of the bankruptcy filing.

5. Has the debtor granted any security interest in any property to secure any debts of any affiliate other than provided in Questions

given by the client after a full and thorough analysis of conflicting interests and competing claims of the limited partnerships against the insider general partner or its affiliated management company for fraudulent conveyances, preferences, equitable subordination, or for any state law right a limited partner may have against its general partner. Even if such disclosure had been given, it is problematical that effective consent could be given by the limited partnership. Such consent would of necessity be given by the general partner because limited partners may not be able to maintain their limited liability if they participate in management. This situation creates a circumstance much like the fox in the henhouse. Perhaps consent could only be given by an appointed equity security holder or noninsider unsecured creditors' committee.

If the hearing on these motions was designed to constitute consent or a waiver of objection, the method employed was insufficient. The debtors failed to give notice to the equity security holders of either the motion for employment or the hearing on the motion. Such a hearing, without notice, could never constitute consent or waiver.

## CONCLUSION

"To disqualify a party's chosen attorney is a serious matter." *City Consumer Serv., Inc. v. Home*, 571 F.Supp. 965, 975 (D.Utah 1983). An actual conflict of interest must exist before the court takes any action contrary to the wishes of the debtor in the selection of its counsel. However, it is the Law Firm's burden to prove both its compliance with the ethical standards of the court and its eligibility for appointment. In these cases, too many questions remain unanswered concerning effective notice, the independent management of the debtors in possession relative to their fiduciary duties, and regarding the claims held by the debtors against Clark Financial or Spence Clark.

The court requires from its officers their very best and most independent judgment in the representation of debtors in possession free from conflicting claims of loyalty or confidentiality. Without reliance upon that independence the process disintegrates. If there is any doubt as to whether multiple representation would be appropriate, the Law Firm should decline the representation.

The unresolved issues in these cases leave the court no alternative but to determine that the Law Firm holds interests adverse to these estates and that it is not disinterested. The motions for appointment are denied.

3 and 4? Has any affiliate granted any security interest in any property to secure any debts of the debtor other than provided in Questions 3 and 4? If yes, list the affiliate, the collateral, the date of the security interest, the creditor to whom it was granted, and the loan balance for the underlying loan.

6. Has any affiliate engaged in any other transaction with the debtor corporation during the past 18 months? If yes, briefly describe the transaction(s).

7. List any affiliate who is potentially a "responsible party" for any unpaid taxes of the debtor. Give the estimated amount of such taxes owed at the time of filing.

8. List the employment of any affiliate by the debtor. List the employment of any relative or partner of any equity security holder by the debtor.

9. List all circumstances under which proposed counsel or proposed counsel's law firm has represented any affiliate during the past 18 months. List any position other than legal counsel which proposed counsel holds in either the debtor or affiliate corporation, including corporate officer, board of directors, or employee. List any amount owed by the debtor or the affiliate to proposed counsel or counsel's law firm at the time of filing or paid within 18 months before filing.